IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Cynthia Sanson, | CASE NO. 1:23-cv-1425 |
| Plaintiff, | DISTRICT JUDGE |
| | James S. Gwin |
| vs. | |
| | MAGISTRATE JUDGE |
| Commissioner of Social Security Administration, | James E. Grimes Jr. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Cynthia Sanson filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

**Procedural background**

In April 2021, Sanson filed an application for disability insurance benefits alleging a disability onset date of May 8, 2020, and a date last insured of June 30, 2021.[1] Tr. 71. She claimed that she was disabled due to

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006). To be eligible for disability insurance benefits under Title II of the Social Security Act, a claimant must establish disability on or

"granulomatosis with polyangiitis, psoriatic arthritis, psoriasis, alopecia totalis, [and] alopecia areata."[2] *Id.*

The Commissioner denied Sanson's applications at the initial level and on reconsideration. Tr. 71–78; 80–87. Sanson requested a hearing before an Administrative Law Judge (ALJ). Tr. 104–05. In June 2022, an ALJ held a hearing at which Sanson and a vocational expert testified. Tr. 37–69. In July, the ALJ issued a written decision finding that Sanson was not disabled. Tr. 12–36. Sanson requested review by the Appeals Council. Tr. 209–12. The ALJ's

---

before her date last insured. *See* 20 C.F.R. §§ 404.101, 404.130–31. As such, the time period relevant to Sanson's application runs from May 8, 2020, to June 30, 2021. *See* Tr. 71, 241.

[2]    Granulomatosis with polyangiitis is one of a group of blood vessel disorders known as vasculitis. *Granulomatosis with Polyangiitis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/granulomatosis-with-polyangiitis/symptoms-causes/syc-20351088 [https://perma.cc/2LY3-FUDY]. It causes inflammation in the blood vessels of the nose, sinuses, throat, lungs, and kidneys, which can lead to the development of "areas of inflammation called granulomas" in the affected tissue. *Id.* The resulting granulomas may slow the flow of blood to the organs and disrupt an affected organ's ability to function. *Id.*

People with psoriasis experience flare-ups of a red, itchy rash with silvery, scaled patches called plaques. *Psoriasis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/psoriasis/symptoms-causes/syc-20355840 [https://perma.cc/YGE9-ZY9J]. Some people with psoriasis also develop joint pain, stiffness, and swelling due to psoriatic arthritis. *Psoriatic Arthritis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/psoriatic-arthritis/symptoms-causes/syc-20354076 [https://perma.cc/Y7ET-JMTB].

Alopecia areata is patchy, unpredictable hair loss that starts with a bald spot in the scalp or beard. *Hair Loss Types: Alopecia Areata Overview*, American Academy of Dermatology, https://www.aad.org/public/diseases/hair-loss/types/alopecia [https://perma.cc/PEW5-GNTN]. For some, the hair regrows with or without treatment and never again falls out. *Id.* For most, loss and regrowth continue to occur. *Id.* Alopecia totalis, or the total loss of hair on the scalp, is also episodic. *Id.*

decision became final in June 2023, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Sanson filed this action in July 2023. Doc. 1. In it, she presents the following issues:

1. Whether the ALJ erred in evaluating the persuasiveness of opinion evidence in the record premised off of an overly narrow view of the relevant evidence.

2. Whether the ALJ erred in making a residual functional capacity finding that did not fully account for limitations arising from Plaintiff's impairments, and thus lacked the required logical bridge between the evidence and the conclusions.

Doc. 8, at 1.

### Factual background

#### 1. Personal and vocational evidence

Sanson was born in July 1955 and was 65 years old on her date last insured. Tr. 71. She is a college graduate and has a master's degree in social work. Tr. 45, 246. Sanson worked for 17 years as the director of care management at a hospital system, overseeing "case management, social work, [and] utilization management." Tr. 47, 246. After that, Sanson worked for 12 years as an administrator at a long-term residential care facility. Tr. 45–46, 246.

#### 2. Relevant medical history

In September 2013, Sanson established care with rheumatologist Alexandra Villa Forte, M.D. Tr. 357. Dr. Villa Forte diagnosed Sanson with

granulomatosis with polyangiitis in October 2013. Tr. 439. She continued to treat Sanson for granulomatosis with polyangiitis, psoriasis, and psoriatic arthritis through the end of the relevant time period. *See, e.g.,* Tr. 357, 384, 387–88, 389–90, 425–27, 431–32, 438–40, 443, 1129–30. Dr. Villa Forte authorized Sanson's biannual[3] infusions of the immunosuppressant Rituximab. Tr. 420, 426, 435, 440, 449, 877, 983, 988–89, 990, 998, 1003, 1007, 1013, 1018, 1090, 1096, 1105. From July 2016 through the end of the relevant time period, Dr. Villa Forte found that Sanson's granulomatosis with polyangiitis was in remission, though, at times, she suggested that it may be "smoldering."[4] *See* Tr. 389, 425, 428, 443, 1093, 1129.

### 3.  *Medical evidence*

In December 2019, Sanson saw Dr. Villa Forte to address sudden onset chest pain. Tr. 438. Dr. Villa Forte determined that Sanson's pain was likely musculoskeletal in nature, rather than related to granulomatosis with polyangiitis. Tr. 438. Although Sanson's granulomatosis with polyangiitis appeared to be in remission, her psoriatic arthritis and psoriasis were active and not responsive to her then-current treatment. Tr. 443. Dr. Villa Forte prescribed Otezla.[5] *Id.*

---

[3]    Sanson sometimes received infusions every five months. *See* Tr. 56.

[4]    It's unclear what Dr. Villa Forte meant by *smoldering*.

[5]    Otezla is used to lower inflammation. *Otezla*, Drugs.com, https://www.drugs.com/otezla.html [https://perma.cc/5EHK-4AF9].

4

In May 2020, Sanson called Dr. Villa Forte's office and spoke with receptionist Patricia Senik. Tr. 431. Sanson told Senik that for about a week, she had felt as if "something [were] stuck in her throat." Tr. 431. Sanson described the sensation as "something sitting on the left side of [her] throat, like a 'pill[.]'" Tr. 432. Sanson denied pain, cough, heartburn, difficulty eating or drinking, or any otolaryngological symptoms. Tr. 431–32. She reported that she'd lost all of her hair but "[i]t was growing back." Tr. 432. Sanson was taking ten milligrams of Prednisone daily to regrow her hair, *see* Tr. 437, which limited her sleep to no more than four or five hours per night and led to daytime fatigue, Tr. 432.

In June, Sanson saw Dr. Villa Forte and complained of nausea, the same throat sensation she had mentioned in May, and mid-chest pain. Tr. 425. Sanson had a normal physical exam. Tr. 426–27. Dr. Villa Forte posited that Sanson's granulomatosis with polyangiitis "may be smoldering." Tr. 428. Computed tomography results from August showed that Sanson had no mass in her throat, no adenopathy, and no laryngeal abnormalities. Tr. 586–88.

In September, dermatologist Wilma Bergfeld, M.D., observed a psoriatic lesion on Sanson's lower leg and suggested that Sanson continue to use Clobetasol ointment. Tr. 409.

During an appointment with Dr. Villa Forte in November 2020, Sanson complained of chronic fatigue, a mild intermittent cough, and shortness of breath when climbing stairs. Tr. 389–90. For exercise, she was walking at least

5

three miles every day. Tr. 390. Sanson's granulomatosis with polyangiitis still "appear[ed] to be in remission." Tr. 1093. Her hair was regrowing and her psoriasis was mild. Tr. 390. The psoriatic arthritis in Sanson's hands and feet was mild to moderate and, at times, her hands swelled. *Id*. Sanson had no new or worsening otolaryngological symptoms. *Id*. Dr. Villa Forte continued the biannual Rituximab infusions and suggested that Sanson taper her daily Prednisone dose from ten milligrams to five. Tr. 388, 393.

During a January 2021 follow-up by phone with Dr. Villa Forte, Sanson reported new psoriasis plaques and worsening joint pain since lowering her dose of Rituximab. Tr. 388. Sanson described "more plaque psoriasis on her scalp," an enlarged plaque on her lower left leg, and plaques on her left arm from her wrist to her elbow accompanied by elbow pain. Tr. 387. Sanson suggested that her symptoms had worsened due to the reduction in Rituximab.[6] Tr. 387, 388. Dr. Villa Forte prescribed Sulfasalazine. Tr. 388.

Earlier that same day, Sanson had a virtual dermatology visit with Dr. Bergfeld. Tr. 386. Dr. Bergfeld noted that Sanson's hair regrowth was going well, even though it was slow. Tr. 386. She found "generalized regrowth of white hair several inches long with few scattered dark hairs (original hair

---

[6]    Sanson references a reduction in Rituximab beginning with her infusion in November 2020. *See* Doc. 8, at 7. Dr. Villa Forte's notes from January 2021 show that Sanson received 500 milligrams of Rituximab during her infusion in November 2020. Tr. 388. Sanson had previously received 753.75 milligrams per infusion. Tr. 420, 426, 435, 440, 449, 877, 983, 988–89, 990, 998, 1003, 1007, 1013, 1018, 1090, 1096, 1105.

auburn color)" on Sanson's scalp. Tr. 384. Dr. Bergfeld observed swelling due to Prednisone and noted that "new lesions of psoriasis on Sanson's forehead and extremities" had appeared since Dr. Villa Forte lowered Sanson's Rituximab dosage.[7] Tr. 384. Dr. Bergfeld recommended that Sanson try occlusive therapy in conjunction with Clobetasol.[8] Tr. 386.

In February 2021, during her annual wellness visit with primary care provider Elizabeth A. Southworth, M.D., Sanson reported "[s]ternal pain" that was "[l]ike severe pain" but "[n]ot crushing." Tr. 379. She said that it did not have a pattern and could last ten minutes to one hour in duration. *Id*. Sanson also reported having sinus headaches and chronic shortness of breath "with steps." *Id*. Sanson indicated that she was exercising daily—walking four miles at a time—and watching her diet. Tr. 379–80. Dr. Southworth found normal reflexes and muscle strength with good tone, a full range of motion in all extremities, intact motor and sensory systems, and a normal gait. Tr. 381.

A week later, Sanson called Dr. Villa Forte's office to report "overwhelming fatigue" and "some joint pain." Tr. 378. She was so fatigued

---

[7]    Dr. Bergfeld recorded a 50 percent reduction in Rituximab—from 1000 to 500 milligrams—in November 2020. *See* Tr. 382. This level of reduction is not cited by any of the other clinicians and is inconsistent with other record evidence. *See supra* note 5.

[8]    Occlusive therapy involves covering an area affected by psoriasis with plastic wrap or waterproof dressing after applying a topical treatment. *What to Know About Occlusion Therapy for Psoriasis*, Medical News Today, https://www.medicalnewstoday.com/articles/occlusion-therapy-psoriasis [https://perma.cc/8TXW-7SJK].

after her daily walk that she would sleep for two hours. *Id*. She was "very frustrated" and "'wanted her life back.'" *Id*.

A bone density scan in March 2021 suggested possible osteopenia[9] in Sanson's lumbar spine. Tr. 490.

Also in March, Sanson had an appointment with Dr. Bergfeld, accompanied by dermatology resident Geraldine Ranasighe. Tr. 373. Dr. Bergfeld found that Sanson had grown short white hair over her scalp, which was still about 50 percent bald. Tr. 372. Sanson's psoriatic arthritis was "some[]what worse since reducing [Rituximab]." Tr. 373. Sanson reported that she was no longer taking Sulfasalazine because it had given her nightmares. *Id*. In April, after conferring with Dr. Villa Forte, Dr. Ranasighe prescribed oral minoxidil to encourage hair regrowth. Tr. 365.

Sanson reported "severe fatigue" to Dr. Villa Forte in April 2021, noting that her fatigue had started around the same time that she began to lose her hair. Tr. 1126. Sanson complained of shortness of breath, pain, weakness, swollen joints, morning joint stiffness, headache, hair loss, and fingernail changes.[10] *Id*. Her skin was normal "without rashes or lesions." Tr. 1127.  She

---

[9]     Osteopenia means low bone mineral density. *See Osteopenia*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/21855-osteopenia [https://perma.cc/DMB3-4KR8].

[10]     Psoriatic arthritis can affect the fingernails, causing pitting, dents, ridges, discoloration, and the separation of the nail from the nail bed. *How Does Psoriatic Arthritis Affect Your Nails?*, Health.com, https://www.health.com/psoriatic-arthritis-nails-7565003 [https://perma.cc/S2PF-F6W2].

had normal sinuses, clear lungs, and a normal neurological exam. Tr. 1128. Although Sanson had some musculoskeletal tenderness and swelling, her motor strength was fully intact at a "5" out of five. *See id*. Sanson's granulomatosis with polyangiitis was "smoldering" and her psoriatic arthritis and psoriasis were active. Tr. 1129. Dr. Villa Forte prescribed Orencia and suggested an at-home sleep study to address Sanson's "excessive daytime sleepiness." T. 1130. The results of the study, which Sanson conducted in May 2021, showed at least moderate obstructive sleep apnea. Tr. 905.

### 4. *State agency and other medical opinion evidence.*[11]

Dr. Villa Forte wrote a letter to Sanson's insurance company in February 2021. Tr. 357–58. In it, Dr. Villa Forte confirmed that Sanson's granulomatosis with polyangiitis and psoriatic arthritis were in remission. Tr. 357. Dr. Villa Forte said, however, that these diseases had caused "permanent damage" and that Sanson continued to experience shortness of breath with physical activity, severe daily fatigue, and joint pain. Tr. 357. Dr. Villa Forte said that Sanson's "[c]hronic symptoms of fatigue, joint pain and stiffness

---

[11]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

would affect her ability to perform work activities and affect her ability to concentrate and complete tasks." Tr. 357–58.

In July 2021, state agency consultative physician Elizabeth Das, M.D., reviewed the evidence. Tr. 70–78. Dr. Das found that despite severe impairments of inflammatory arthritis and dermatitis, Sanson was not disabled. Tr. 73–74, 75–76. According to Dr. Das, Sanson had the residual functional capacity (RFC)[12] to lift or carry 20 pounds occasionally and 10 pounds frequently. Tr. 75. Sanson could sit, stand, or walk for six hours in an eight-hour workday. *Id*. Dr. Das found unlimited Sanson's abilities to balance, kneel, crouch, crawl, and climb ramps or stairs. Tr. 76. She found that Sanson could frequently stoop and climb ladders, ropes, or scaffolds. *Id*. Dr. Das did not find that Sanson had any manipulative, visual, communications, or environmental limitations. *Id*. Dr. Das acknowledged Sanson's history of psoriatic arthritis but noted that the record lacked evidence of active arthritis during the relevant time period. *Id*. State agency consultative physician Abraham Mikalov, M.D., reviewed the evidence on reconsideration in October 2021 and affirmed Dr. Das's findings. Tr. 85.

In June 2021, state agency consultative psychologist Bonnie Katz, Ph.D., reviewed the evidence and found that Sanson had no severe mental

---

[12]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

impairments. Tr. 73–74. Dr. Katz noted that Sanson was seeking disability benefits only and did not allege any mental health conditions. Tr. 74. While acknowledging Sanson's indication that she took Xanax to help her sleep, Dr. Katz noted that Sanson did not see a mental health provider. Dr. Katz recited Sanson's self-report that she did "not hav[e] any mental health conditions impacting her ability to work" and her primary care physician's statement that Sanson's "anxiety [wa]s in remission." *Id*. Dr. Katz found no evidence of severe mental impairment and determined that no mental RFC limitations were warranted. Tr. 74. Paul Tangeman, Ph.D., reviewed the evidence on reconsideration in October 2021 and affirmed Dr. Katz's findings. Tr. 82.

In July 2021, consultative examiner Dariush Saghafi, M.D., conducted a physical examination. Tr. 1295–1301. Sanson reported shortness of breath that persisted despite treatment. *See* Tr. 1293. Dr. Saghafi found that Sanson suffered from dry skin and alopecia universalis. Tr. 1294. He found that Sanson was alert and followed commands. *Id*. She was articulate and "comprehend[ed] everything." *Id*. She had a normal short-term memory and no difficulty with calculation. *Id*. Dr. Saghafi found that, physically, Sanson had normal—"5" out of five—motor strength and sensation throughout each of her extremities and a normal gait. Tr. 1294–95. Her "deep tendinous reflexes" were "+2" out of four "globally" in her extremities. Tr. 1295. Dr. Saghafi found that Sanson was capable of lifting up to 20 pounds and that she could bend, walk, and stand for up to one mile. *Id*. He found that Sanson was able to understand

11

her environment as well as her peers, could communicate satisfactorily, and could travel independently. *Id.*

In May 2022, Dr. Villa Forte completed a responsive Social Security Administration medical source statement. Tr. 2063–66. She found that Sanson had no limitations interacting with others or understanding, remembering, or applying information. Tr. 2063. She found that Sanson was limited in the ability to concentrate, persist, or maintain pace and the ability to adapt or manage oneself. Tr. 2064.

Dr. Villa Forte classified Sanson as "extremely limited" in the ability to "work a full day without needing more than the allotted number or length of rest periods during the day." Tr. 2064. She opined that Sanson was markedly limited in the ability to "work at an appropriate and consistent pace" and "sustain an ordinary routine and regular attendance at work." *Id.* She found that Sanson was moderately limited in the ability to "complete tasks in a timely manner" and "adapt to changes" and mildly limited in the ability to "ignore or avoid distractions while working" and "respond to demands." *Id.*

Dr. Villa Forte opined that Sanson had no limitations: (1) initiating and performing a task that she understood and knew how to do, (2) changing activities or work settings without being disruptive, (3) working close to or with others without interrupting or distracting them, (4) managing her psychologically based symptoms, (5) distinguishing between acceptable and unacceptable work performance, (6) setting realistic goals, (7) making plans

12

for herself independent of others, (8) maintaining personal hygiene and attire appropriate to a work setting, and (9) being aware of normal hazards and taking appropriate precautions. Tr. 2064.

Dr. Villa Forte continued, finding that, physically, Sanson could lift two pounds occasionally and less than one pound frequently. Tr. 2065. She said that Sanson tended to drop things. *Id*. She opined that Sanson could stand or walk for a maximum of two hours during an eight-hour workday and needed to take a break after standing or walking for less than an hour. *Id*. Dr. Villa Forte found that Sanson could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. She said that Sanson could reach, push, or pull rarely and manipulate objects occasionally. Tr. 2066. Dr. Villa Forte opined that Sanson needed a cane for ambulation and required a job that allowed her to elevate her legs and alternate between sitting, standing, and walking at will. *Id*. Dr. Villa Forte said that Sanson had severe pain that would interfere with concentration, take Sanson off task, and cause absenteeism. *Id*. Dr. Villa Forte found that Sanson was unable to work an eight-hour day. Tr. 2066.

### 5. *Pain questionnaire*

In May 2021, Sanson completed a "pain questionnaire" as part of her application for disability benefits. Tr. 274–76. She indicated that she had pain in her hands and feet and that, particularly during flares of psoriatic arthritis, she experienced pain in other joints including her wrists, hips, spine, knees, and elbows. Tr. 274. Sanson noted that she did not think she was too limited

13

at that time and that although moving caused pain, her physician had advised her to keep moving to main movement in her joints. *Id*. She said that she was not as active as she used to be, primarily due to fatigue and shortness of breath, though the pain in her hands and feet contributed somewhat to her restricted activity. Tr. 275.

### 6. *Testimonial evidence*

Sanson and a vocational expert testified during the hearing in June 2022. Tr. 37–69. Sanson was represented by attorney Emily Gilbert Warren. Tr. 37, 42–43, 66–69. Warren began the substantive portion of the hearing with an opening statement advocating that the ALJ find Sanson disabled. Tr. 42–43. Sanson then testified.

Sanson discussed her worsening granulomatosis with polyangiitis, which, along with psoriatic arthritis, psoriasis, and alopecia, made it very difficult for her to make it through a workday. Tr. 50–51. She indicated that she was too short of breath to cross a room or climb stairs. Tr. 51. Sanson described morning joint pain due to psoriatic arthritis and constant fatigue that required her to nap even from taking a shower. Tr. 52. Sanson described her fatigue as her most debilitating condition and indicated that it affected her concentration. Tr. 59, 61. She regularly napped four to six times throughout the day. Tr. 61–62.

She testified that psoriatic arthritis was more pain related. Tr. 59. She indicated that she had a significant amount of pain in her hands that made it

particularly painful for her to use her index fingers and thumbs, so activities like turning a handle or opening a jar were increasingly difficult. Tr. 60. She also had a significant amount of pain in her feet, and sometimes her hands and feet swelled. *Id.*

Sanson discussed her activities of daily living with the ALJ. She testified that she was able to do some light housekeeping but could no longer cook family meals on Sundays, host her grandchildren on weekends, or care for her elderly parents. Tr. 52, 54. Sanson was able to shower and get dressed on her own, but she often asked her sister to come over and help her with her laundry. Tr. 52, 54. Sanson's sister or her daughters would handle Sanson's grocery shopping. Tr. 54. Sanson was supposed to take methotrexate for her granulomatosis with polyangiitis but it caused even more fatigue and nausea so it was difficult for her to take. Tr. 53. She needed time to recover from each infusion of Rituximab and when she was working, her employer routinely accommodated her missing days of work due to the recovery time. Tr. 56.

Vocational expert Mark Anderson testified after Sanson. Tr. 63–68. Anderson testified that a hypothetical individual with the same age, education, and work experience as Sanson and with the limitations assessed in Sanson's RFC, described below, could perform work at a light exertional level. Tr. 65. He said that this included Sanson's work as a director of care management as it was generally and actually performed. Tr. 64–65. Anderson found that the ALJ's hypothetical individual could perform Sanson's past work as an

administrator at a residential care facility, too, though only as this job was generally performed and not as Sanson had performed it. Tr. 65. Anderson testified that restricting Sanson to sedentary work would preclude Sanson's past work as an administrator but that Sanson would still be capable of performing her past work as a director of care management as the job was generally, not actually, performed. Tr. 65. Being off task for more than 15 percent of the workday or absent more than twice per month would preclude all work. Tr. 65–66.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2021.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 8, 2020 through her date last insured of June 30, 2021 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: inflammatory arthritis (psoriatic arthritis); alopecia; and granulomatosis with polyangiitis (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the

16

claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except can occasionally climb ladders, ropes, or scaffolds, and can occasionally stoop.

6. Through the date last insured, the claimant was capable of performing past relevant work as an Administrator, Healthcare Facility and Casework Supervisor. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 8, 2020, the alleged onset date, through June 30, 2021, the date last insured (20 CFR 404.1520(f)).

Tr. 15–30.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments,

17

that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *Whether substantial evidence supports the ALJ's evaluation of the medical opinion evidence*

In his decision, the ALJ found persuasive the medical opinions of state agency physicians Elizabeth Das, M.D., and Abraham Mikalov, M.D., and state agency psychologists Bonnie Katz, Ph.D., and Paul Tangeman, Ph.D. Tr. 28.

19

The ALJ determined that the medical opinions of treatment provider Alexandra Villa Forte, M.D., were not persuasive.[13] Tr. 28. The ALJ noted the state agency doctors had agreed that Sanson was capable of work that required a light level of exertion with additional limitations to no more than frequent stooping and climbing. Tr. 28 (citing Tr. 71–78, 80–87). The ALJ's indicated that his rationale for finding the state agency doctors' opinions persuasive was that they accounted for the likely effects of Sanson's fatigue, shortness of breath with exertion, joint tenderness, and swelling on her ability to work. Tr. 28. Then the ALJ addressed Dr. Villa Forte's medical opinion evidence.

The ALJ found unpersuasive Dr. Villa Forte's opinions after determining that her opined limitations were inconsistent with evidence of a "normal gait, full musculoskeletal range of motion, clear lungs, clear skin without rash or lesions, and full strength in her bilateral upper and lower extremities." Tr. 28 (citing Tr. 379–82, 388–93, 424–29, 1125–36, 1293–1301, 1348–52, 1388–94). The ALJ found that Dr. Villa Forte's greater opined limitations were inconsistent with evidence of "partial hair regrowth with treatment, assessed periods of remission of [granulomatosis with polyangiitis], and reports that [Sanson] walked three to four miles for exercise" daily. *Id* (citing Tr. 379–82, 382–87, 388–93, 418–22, 438–43, 1114–21, 1125–36, 1222–23, 1252–58, 1388–94, 1537–44). The ALJ acknowledged that Dr. Villa Forte

---

[13]    The ALJ also found partially persuasive the medical opinions of consultative examiner Dariush Saghafi, M.D., however, Sanson does not raise any objections to the ALJ's evaluation of Dr. Saghafi's opinions.

had a years-long "established treating relationship" with Sanson but nonetheless found that the degree of limitation Dr. Villa Forte found was not consistent with or supported by the evidence in the record. Tr. 28. The ALJ also noted that Dr. Villa Forte had completed her medical source statement in May 2022, nearly a year after the end of the relevant time period.[14]

Sanson says that the ALJ erred in evaluating Dr. Villa Forte's opinions and the medical opinions of the state agency physicians due to an "overly narrow view of the relevant evidence." Doc. 8, at 15. She says that Dr. Villa Forte's opined limitations in May 2022 were consistent with her opined limitations in February 2021. Doc. 8, at 16. Sanson says that the ALJ discounted Dr. Villa Forte's May 2022 functional assessment and should not have done so. Doc. 8, at 16–17. She says that the February 2021 letter contained opinions "consistent with and supported by the medical record" and that, as such, "[Dr. Villa Forte's letter] should [have been] deemed persuasive and given deference." Doc. 8, at 15–16. Sanson is mistaken.

As an initial matter, the ALJ was not required to give weight to many of Dr. Villa Forte's statements in the February 2021 letter. Her conclusion— that "Sanson [was] unable to work at [that] time and [would] not be able to return to work due to chronic symptoms that prevent[ed] her from performing all of her job responsibilities"—is "neither inherently valuable nor persuasive"

---

[14]     The relevant time period here is from May 8, 2020, to June 30, 2021. *See* Tr. 71, 241, n.1.

as it is a statement on issues reserved to the Commissioner. *See* Tr. 24; 20 C.F.R. § 404.1520b(c)(3).

Nonetheless, the ALJ considered Dr. Villa Forte's medical opinions—from the May 2022 functional assessment and the February 2021 letter—ultimately finding them unpersuasive. *See* Tr. 28. He also considered the medical opinions of the state agency consultant physicians and psychologists, finding them persuasive. Doc. 8, at 17–18. Sanson seems to argue that the ALJ erred in finding unpersuasive Dr. Villa Forte's opinions particularly in comparison to finding persuasive the opinions of the state agency doctors. *See* Doc. 8, at 17–18.

Under the applicable standard, an ALJ assessing the persuasiveness of a medical opinion is required to consider the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain supportability and consistency when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth

in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ addressed the factors of supportability and consistency as he summarized Sanson's evidence and as he determined Dr. Villa Forte's more restrictive limitations lacked internal support and were not consistent with the rest of the evidence. *See* Tr. 28. He dedicated more than two-thirds of his 15-page decision to Sanson's medical records and testimonial evidence. *See* Tr. 18–28. He summarized the evidence throughout his decision in support of each of his findings, including his persuasiveness findings. *See* Tr. 21, 28. As further explained below, the ALJ adhered to the guidelines of the Social Security Administration in his persuasiveness findings and did not err in assessing the medical opinion evidence.

The ALJ found that Sanson's psoriatic arthritis, alopecia, and granulomatosis with polyangiitis were severe impairments and that her osteopenia, obesity, sleep apnea, anxiety, and mental health issues were not. Tr. 18–19. He found that Sanson had no severe mental impairments and was not limited in any of the four broad areas of mental functioning: understanding and memory, sustained concentration and persistence, social interaction, and adaptation.[15]

---

[15] The Social Security Administration divides the mental functioning necessary in a work setting into four broad areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing

Then, despite Sanson's claims to the contrary, the ALJ specifically considered Dr. Villa Forte's May 2022 mental functional assessment, documenting his consideration of her decision. Tr. 20. He acknowledged that the assessment was based on Dr. Villa Forte treatment of Sanson since 2013. *Id*. He noted that Dr. Villa Forte found no limitations in Sanson's ability to understand, remember, or apply information and no limitation in her ability to interact with others. *Id* (citing Tr. 2063–64). The ALJ recited Dr. Villa Forte's finding that Sanson was extremely limited in the broad area of concentrating, persisting, or maintaining pace. *Id* (citing Tr. 2064). He specifically recited Dr. Villa Forte's finding that "Sanson had an extreme limitation [in the ability to] work[] a full day without needing more than the allotted number or length of rest periods during the day." *Id* (citing Tr. 2064). He recited Dr. Villa Forte's finding Sanson had "marked limitations [in the ability to] work[] at an appropriate and consistent pace and … sustain[] an ordinary routine and regular attendance at work." *Id* (citing Tr. 2064). The ALJ noted Dr. Villa Forte's finding that Sanson was "moderate[ly] limit[ed] [in the ability to] complet[e] tasks in a timely manner and … mild[ly] limit[ed] [in the ability to] ignore[e] or avoid[] distractions while working." *Id* (citing Tr. 2064). The ALJ recited Dr. Villa Forte's finding that "Sanson had a moderate

---

oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A1. When the Commissioner evaluates a claimant's mental functioning, he considers these four broad areas as well as the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. *Id*.

limitation [in the ability to] adapt[] to changes and a mild limitation [in the ability to] respond[] to demands." *Id* (citing Tr. 2064).

The ALJ further considered Dr. Villa Forte's rationale for her opinions, including her indication that she had formed her opinions based on Sanson's psoriatic arthritis, "which caused joint pain, swelling, and synovitis," psoriasis, "which caused skin lesions," and granulomatosis with polyangiitis, "which caused extreme fatigue, shortness of breath, cough, joint pain, sinusitis, hearing loss, sinus abnormalities, and abnormal chest CT scans." Tr. 20–21 (citing Tr. 2063–66). The ALJ observed that Dr. Villa Forte supported her opined limitations with reference to her personal examinations of Sanson throughout the relevant time period. Tr. 20–21 (citing Tr. 2063–66).

The ALJ then addressed the mental impairment findings of state agency consultative psychologists Dr. Katz and Dr. Tangeman, who opined that Sanson had no severe mental impairments and no limitations across the four broad areas of mental functioning. *See* Tr. 21 (citing Tr. 71–78, 80–87).  The ALJ wrote that the opinions of Doctors Katz and Tangeman were consistent with and supported by the evidence. Tr. 21. The ALJ supported these findings by referencing the medical records. He cited treatment notes from primary care provider Richard Assaf, M.D, who found Sanson's mood and affect pleasant. Tr. 21 (citing Tr. 347, 352).  He recited Dr. Bergfeld's notes, which contained consistent findings over time that Sanson appeared well and was oriented to person, place, and time with a pleasant demeanor and an appropriate mood

25

and affect. *Id* (citing Tr. 371, 384, 408, 420, 435, 1004, 1013, 1106, 1118, 1126, 1256). The ALJ cited consultative physical examiner Dr. Saghafi, who found Sanson alert and oriented to person, place, and time with intact repetition and naming skills and the ability to follow commands, articulate, comprehend, and calculate without difficulty. *Id* (citing Tr. 1293). He noted that Dr. Saghafi found normal short-term memory, cranial nerves, and muscle bulk and tone. *Id* (citing Tr. 1293–94). The ALJ cited Dr. Villa Forte's findings that Sanson had no sinus tenderness, epistaxis, ear pain, sore throat, difficulty swallowing, or mouth lesions, generally appeared well, had normal skin, and had no joint tenderness or swelling. *Id* (citing Tr. 1389–91). The ALJ recited Dr. Villa Forte's findings that Sanson had an appropriate mood and affect, a pleasant demeanor, appeared generally well, and was oriented to person, place, and time. *Id* (citing Tr. 1540).

The ALJ found additional support for his persuasiveness findings in that the less restrictive opined limitations of the state agency doctors—as opposed to Dr. Villa Forte's more restrictive opined limitations—were consistent with the lack of evidence of subjective complaints regarding psychological symptoms. Tr. 21. The ALJ highlighted the fact that Sanson hadn't received any specialized treatment from a mental health professional during the relevant time period. *Id*.

The ALJ observed that Dr. Villa Forte's opined mental impairment limitations were not consistent with the opined mental impairment

limitations—or lack thereof—determined by psychologists Katz and Tangeman. Tr. 21. He further observed that Dr. Villa Forte's opined mental impairment limitations were not consistent with the rest of the evidence, including her own treatment notes. *Id*. He noted that Dr. Villa Forte did not specialize in mental health and pointed out that she cited physical symptoms, as opposed to mental symptoms, in support of her opined *mental impairment* limitations. *See* Tr. 21; *see also* Tr. 2063–64. In so doing, the ALJ addressed the factors of consistency and supportability with respect to the unpersuasive medical opinions of Dr. Villa Forte and the persuasive medical opinions of the state agency doctors. Tr. 18–28.

Sanson says that the ALJ "wholly dismiss[ed Dr. Villa Forte's] the May 2022 functional assessment without further consideration" and "rejected her opinion evidence after finding that the May 2022 assessment [was] outside the period under review by several months." Doc. 8, at 17 (citing Tr. 28). That's simply not true.

It was only after a fairly robust examination of the medical opinion evidence that the ALJ stated "[f]urthermore," that Dr. Villa Forte's May 2022 functional assessment was "produced outside the period under review." Tr. 21. The ALJ noted that Dr. Villa Forte had completed the functional assessment nearly a year after the end of the relevant time period, but he did not reject Dr. Villa Forte's opinions "without further consideration" at that point. *See* Tr. 21; Doc. 8, at 17. The ALJ in fact considered Dr. Villa Forte's opinions in detail

with specific, adequate attention to the factors of supportability and consistency. *See* Tr. 21, 28. He similarly considered supportability and consistency when he evaluated the opinions of the state agency doctors. Tr. 21, 28. And supportability and consistency are the only two factors the ALJ was required to articulate. *See* 20 C.F.R. §§ 416.920c(a), (b)(2). Sanson calls the ALJ's rationale a "barebone two-fold position" and says that the ALJ used boilerplate language to support his findings, rather than specifics from the record. Doc. 8, at 16. These assertions cannot be squared with the ALJ's decision.

Sanson says that the evidence supports the more extreme limitations opined by Dr. Villa Forte and cites, in particular, the evidence establishing her symptoms of severe fatigue, shortness of breath, and joint pain, tenderness, and swelling. Doc. 8, at 17–19 (citing Tr. 357, 426–27, 441, 1128). As the Commissioner points out, however, the ALJ acknowledged this very evidence. *See* Doc. 10, at 8. And the ALJ cited severe fatigue, shortness of breath, and joint pain, tenderness, and swelling as he examined whether there was adequate evidentiary support for Dr. Villa Forte's opined limitations and concluded that there was not. *See* Tr. 21, 23–25, 28.

For example, the ALJ cited Sanson's subjective complaints and her testimony about shortness of breath and debilitating fatigue. *See* Tr. 21, 23–25. He credited the clinical findings of joint pain, tenderness, and swelling. Tr. 23–25, 28. Then the ALJ juxtaposed this subjective and objective evidence with

Sanson's self-reported ability to walk for several miles at a time, and her clinician's routine findings of full strength, normal gait, intact range of motion, clear lungs, and clear skin. Tr. 28 (citing Tr. 379–82, 388–93, 424–29, 1125–36, 1293–1301, 1348–52, 1388–94). As the ALJ indicated, Dr. Villa Forte's opined limitations would prohibit Sanson from performing activities that the evidence showed she could—and regularly did—perform. *Compare*, *e.g.*, Tr. 379–80, 390, *with* Tr. 2063–66.

Sanson recites her diagnoses and symptoms, arguing that she has shown she has limitations consistent with Dr. Villa Forte's opined limitations. *See* Doc. 8, at 18 (citing the "significant onset of alopecia and ongoing psoriatic lesions" and describing Sanson's ongoing symptoms despite the remission of her granulomatosis with polyangiitis and psoriatic arthritis). But Sanson cannot refute the ALJ's adequately supported findings as to Dr. Villa Forte's medical opinions by reciting symptoms and listing diagnoses. 20 C.F.R. §§ 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"), 416.929(a) (same); s*ee also Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 589 (6th Cir. 2019) ("disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it") (quoting *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014)). In addition, Sanson's argument, which amounts to an invitation to reweigh the evidence, ignores the standard of review. *See Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020).

The ALJ determined that the record did not support the extreme limitations Dr. Villa Forte placed on Sanson's abilities or Dr. Villa Forte's determination that Sanson would not be able to work a full day. Tr. 21, 28; *see also* Tr. 2063–66. Sanson fails to demonstrate any specific flaw in the ALJ's logic or otherwise show that the ALJ's conclusions were based on less than substantial evidence. The ALJ thus was on a sure footing in discounting the opinion. *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

As discussed, the ALJ adequately explained his rationale for the contested persuasiveness findings. Tr. 28. And as long as an ALJ adequately explains his or her decision, he or she need not fully adopt the opinion of any medical source. *See Wright v. Colvin*, No. 1:15-cv-1931, 2016 WL 5661595, at *10 (N.D. Ohio Sept. 30, 2016); *Jefferson v. Colvin*, No. 1:14-cv-01851, 2015 WL 4459928, at *6 (N.D. Ohio July 21, 2015). Sanson may not agree with the ALJ's conclusions, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15-cv-1269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

*2.  Whether the ALJ sufficiently accounted for Sanson's limitations when he crafted the RFC, and whether substantial evidence supports the ALJ's RFC findings.*

Sanson argues that the ALJ's RFC assessment is not supported by substantial evidence. Doc. 8, at 19. She says that the ALJ erred by relying on the opinions of the state agency reviewing physicians. *Id.* at 19–20. According to Sanson, "the ALJ did not fully recognize [Sanson's] limitations, specifically those related to her fingers/hands, fatigue and shortness of breath." *Id.* at 20.

An individual's RFC is "'the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs.'" *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 399 (6th Cir. 2018) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c)); *see also Howard*, 276 F.3d at 239 (explaining that an RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account") (quoting 20 C.F.R. § 416.945). It is the claimant's burden to establish that he or she has a medically determinable impairment and the extent to which that impairment affects his or her ability to function. *See* 20 C.F.R. § 404.1512 ("In general, you have to prove to us that you are blind or disabled."); *see also Gutierrez v. Bowen*, 875 F.2d 864 (6th Cir. 1989) ("The burden is on the claimant to establish a prima facie case of disability."). Even at step five, it is not the Commissioner's burden "to prove a claimant's" RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

31

The ALJ found that Sanson's impairments of psoriatic arthritis, alopecia, and granulomatosis with polyangiitis were severe. Tr. 18. He nonetheless found that that she had the RFC to perform light work as defined by the Social Security Administration. Tr. 22. Sanson says that the ALJ did not adequately account for "the limitations arising from [Sanson's] impairments" in the RFC and that, as a result, there is no "logical bridge" between the evidence and the RFC findings.  Doc. 8, at  19. Her argument fails for several reasons.

Light work is defined at 20 C.F.R. § 404.1567(b) as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." Although the weight requirements for lifting may be "very little," the Social Security Administration explains that a job may be categorized as light when it involves "a good deal of walking or standing, or … sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ALJ added further restrictions to Sanson's capacity for stooping and climbing. Tr. 22. He cited fatigue, shortness of breath with exertion, joint swelling and tenderness, and mild degeneration in her hand and knee as the basis for Sanson's RFC restrictions as to lifting and carrying, standing and walking, and only occasionally stooping or climbing up ladders, ropes, or scaffolds. Tr. 28.

Sanson acknowledges that the ALJ considered her fatigue, shortness of breath, joint swelling and tenderness, and mild knee and hand degeneration.

32

*See* Doc. 8, at 20. She argues, however, that despite what the ALJ said, he failed to fully appreciate the limitations caused by her fatigue, shortness of breath, joint swelling and tenderness, and mild knee and hand degeneration. *Id*.

Sanson, however, does not argue that the ALJ overlooked any evidence. Instead, she cites undisputed evidence of fatigue, shortness of breath, joint swelling and tenderness, and mild knee and hand degeneration—also cited by the ALJ—and implies that the ALJ should have determined these factors had an even greater negative effect on her ability to function. *See* Doc. 8, at 20–21. Indeed, Sanson says that it is "difficult to conceive how the ALJ actually considered Ms. Sanson's fatigue, shortness of breath and hand limitations in his residual functional capacity finding." *Id.* at 22.

Contrary to what Sanson says, however, the ALJ explained how he had considered Sanson's fatigue, shortness of breath, joint swelling, pain, and tenderness, and mild degeneration in the hand and knee as he accounted for each symptom in Sanson's RFC.

For starters, the ALJ explained that Sanson's "statements about the intensity, persistence, and limiting effects of her symptoms [were] inconsistent because the level of limitation alleged [was] not altogether supported by the objective findings." Tr. 27. In this regard, he noted Sanson's ability to walk three to four miles and her "full musculoskeletal range of motion, a normal gait, intact strength in her" arms and legs, clear lungs, and clear skin without

rash or lesions." Tr. 27. He also noted that a "CT scan of [Sanson's] neck showed no mass or adenopathy as well as a patent airway and normal larynx" and that "examination results reflect evidence of partial hair regrowth on [Sanson's] scalp." Tr. 27.

Further, the ALJ cited Sanson's testimony and statements about her experience with fatigue, shortness of breath, joint swelling and tenderness, and mild degeneration in her knees and hands issues. *See* Tr. 21 (crediting the fact that Sanson's diagnosis for granulomatosis with polyangiitis caused, among other symptoms, "extreme fatigue … [and] shortness of breath"), 23 (reciting Sanson's questionnaire answers and testimony, specifically her experience of "severe and debilitating fatigue[,] … reli[ance] on other[s] to perform grocery shopping due to lack of stamina[, and] … shortness of breath affected her ability to complete tasks" as well as her description of "bilateral hand and foot pain [and] multi-joint pain during flares of her psoriatic arthritis that worsened with movement") (citing Tr. 274–76).

The ALJ also considered Sanson's fatigue, shortness of breath, joint swelling and tenderness, and mild degeneration in the knee and hand when he reviewed the medical evidence. *See* Tr. 24 (citing Tr. 1222–23 (November 2020 notes from Dr. Villa Forte recording Sanson's "concerns with chronic fatigue, mild intermittent cough, and shortness of breath when going up stairs" and explaining that her "symptoms of psoriatic arthritis had been mild with mild to moderate pain in her hands and feet with intermittent swelling of her

hands"), 25 (citing the February 2021 letter[16] in which Dr. Villa Forte opined that "[d]espite achieving remission, [Sanson] suffered permanent damage and morbidity from [psoriatic arthritis and granulomatosis with polyangiitis] … includ[ing] shortness of breath with activity, severe daily fatigue with minimal activities, and joint pain" and April 2021 notes from Dr. Villa Forte recording Sanson's reports of "ongoing severe fatigue as well as shortness of breath, arthralgias, muscle weakness, joint swelling, morning joint stiffness, headache, hair loss, and nail changes."), 25–26 (Dr. Saghafi's notes recording shortness of breath, increasing fatigue, and hand pain" which Sanson rated at "a three out of ten on the pain scale" as well as findings of "adequate pulmonary [function], … [normal] motor tone and bulk[,] … 5+/5 strength in her bilateral upper and lower extremities, full musculoskeletal range of motion, [intact] sensation[,] … mild joint space narrowing of the medial joint [in her right knee, and] … mild joint space narrowing of the distal interphalangeal joints of the second, third, fourth, and fifth digits [on her right hand].")

In his evaluation of the medical opinion evidence, the ALJ examined the likely effects of fatigue, shortness of breath, joint swelling and tenderness, and mild degeneration in her knees and hands on Sanson's ability to work. *See* Tr. 28 (noting that the ALJ found persuasive the opinions of Doctors Das and Mikalov, which restricted Sanson to a maximum level of light exertion "with

---

16    Sanson also cites Dr. Villa Forte's February 2021 opinion letter to support her argument that the ALJ "did not fully recognize" the limitations caused by Sanson's impairments. *See* Doc. 8, at 20–21; *see also* Tr. 357–58.

frequent climbing of ramps and stairs and frequent stooping," *specifically
because* they "account[ed] for the effects of [Sanson's] fatigue, shortness of
breath with exertion, [and] joint tenderness and/or swelling.") (citing Tr. 71–
78, 80–87).

Sanson says that the ALJ "ignored the severity of [her] impairments."
Doc. 8, at 22. She disagrees with the degree of limitation the ALJ determined
and incorporated into her RFC. Doc. 8, at 22. But, as discussed, the ALJ
supported his RFC findings with substantial evidence from Sanson's testimony
and statements, medical records, and persuasive medical opinion evidence.
*See, e.g.,* Tr. 18–28. In this regard, an ALJ is permitted to rely on objective
exam findings when evaluating a claimant's alleged symptoms. *See* Soc. Sec.
Ruling 16-3p, 2017 WL 5180304, at *5, 7 (Oct. 25, 2017) (the ALJ considers the
claimant's objective exam findings when evaluating the intensity, persistence,
and limiting effects of the claimant's symptoms). An ALJ may also rely on the
observations of treatment providers. *See* Soc. Sec. Ruling 16-3p, 2017 WL
5180304, at *4–7.

Even if, as Sanson alleges, her evidence about the limiting effects of
fatigue, shortness of breath, joint swelling and tenderness, and mild
degeneration in her knees and hands was corroborated by and consistent with
Dr. Villa Forte's findings, *see* Doc. 8, at 21, that fact doesn't mean that the
ALJ's findings, including that Sanson's "statements concerning the intensity,
persistence and limiting effects of [her] symptoms [were] not entirely

consistent with the medical evidence and other evidence in the record[,]" Tr. 23, were *not* supported by substantial evidence. Whether the record might support a more restrictive RFC is irrelevant because Sanson has not shown that substantial evidence does *not* support the ALJ's RFC finding, that she was able to meet the requirements for light work. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("So long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position.)

Further, despite Sanson's framing of her argument, this Court is not responsible for determining whether, in fact, Sanson was capable of light labor with the additional limitations set by the ALJ in the RFC. *See* Doc. 8, at 22. Deciding that would require the Court to reweigh the evidence, which, again, it cannot do. *Rottmann*, 817 F. App'x. at 196.

Lastly, Sanson claims that the ALJ erred in finding that she could perform her past relevant work. Doc. 8, at 22. She argues that the ALJ erred by relying on the testimony of the vocational expert in making this finding because ALJ's hypothetical did not "accurately portray" Sanson's physical and mental limitations. *See id*. To a large extent, this amounts to a further challenge to the ALJ's RFC assessment. Indeed, Sanson doesn't specify what was wrong with the ALJ's hypothetical. But even if she had, her argument would still fail because an ALJ is only required to incorporate in the RFC or

hypothetical those limitations that the ALJ accepts as credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In sum, Sanson hasn't shown that the ALJ erred with respect to the RFC. Her RFC challenge disregards the standard of review, ignores the ALJ's decision, neglects her own evidence, and contravenes controlling legal authority and statutory guidance.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 13, 2024

>  */s/ James E. Grimes Jr.*
>  James E. Grimes Jr.
>  U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).